IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| LAURIE YOUNG and AMBER MCMILLIN, on behalf of themselves and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) Case No. 06-0321-CV-W-NKL ) |
| v. | ) ) |
| CERNER CORPORATION, | ) ) |
| Defendant. | ) |

**ORDER**

Laurie Eleanor Young, the sole-remaining plaintiff, alleges her former employer, Cerner Corporation, violated the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201 *et seq.*, by failing to pay her overtime. Cerner contends they are not required to compensate Young for overtime because her position as a software engineer is exempt from the FLSA under 29 U.S.C. § 213(a)(1), 29 U.S.C. § 213(a)(17), and 29 C.F.R. § 541.400. In addition, Cerner asserts Young is exempt under the administrative exemption in 29 C.F.R. § 541.200 and 29 C.F.R. § 541.402. Cerner moves for summary judgment [Doc. # 81], which this Court now grants.

**I.      Factual Background**

Many of the background facts have been detailed in an earlier order, *Young v. Cerner Corp.*, No.06-0321-CV-W-NKL, 2007 WL 172361 (W.D. Mo. Jan. 18, 2007) (order denying

1

conditional certification of representative action) [Doc. #55], so this Court addresses only those facts material to Cerner's motion for summary judgment. Young was employed at Cerner from September 2004 to October 2005 as a software engineer, specifically working with a product called Informatica, a visual or graphical tool used to develop Structured Query Language (SQL) and to extract, transform and load data. Informatica "transforms" data by sorting data, cleansing data or applying business logic to the data. Business logic requires data to perform in a certain way.

When Young applied to Cerner, her resume indicated she worked previously as a "software engineer," when in reality she had been an "associate software engineer." As a result of her resume and interview, Cerner hired her as a Level 6 software engineer, one step above the lowest tier, with a yearly starting salary of $65,000. Cerner describes a software engineer as being "responsible for writing code to meet user interface specifications." Young maintains that her day-to-day activities were different than Cerner's stated job description and that she never "wrote" code as part of her job. She was simply involved in defect resolution, wherein she "would try to fix the issue." Young also admits that she transformed data using Informatica.

A "defect" exists when the system or program is not producing the required result. One example of Young's defect resolution tasks included looking at a "lookup"–one of the Informatica transformations–to see if it was asking to pull the correct data from the database. If it was not pulling the correct data, Young "would change the statement or whatever it's asking for to pull the correct field." If the lookup was requesting the correct data but still not

2

Case 4:06-cv-00321-NKL   Document 96   Filed 08/28/07   Page 2 of 11

producing the correct response, Young "would look just within the other transformations within the map," such as a filter or a router. If Young thought she'd determined how to fix the defect, she would fix it at that point in time.

Further, although Young claims she did not develop and execute test plans, she does admit that she tested her solutions. She performed two types of tests–white box testing and black box testing–to verify that her analysis, design and modification of the defect solution met user and system design specifications. Young would perform white box testing to test "the data that was manipulated to make sure that [she had] the right data." After running a white box test, Young participated in a Code Review, where she and a group of her peers would review her modifications and make sure the defect was fixed correctly, including identifying potential quality issues with the defect resolution. Young then performed a black box test, which tests how the defect resolution works when it is moved into another environment, ensuring the solution did not cause additional problems.

Additionally, on at least one occasion Young worked with a "Readme," described as "a stored procedure that calls a function." Young states that initially she just copied a Readme that someone had given her, but she then "had to modify a portion of it." Part of that modification included Young "typing in instructions for it, which function to call," such as "[i]nstructions to call Table A, instructions to call Table B, whatever it may be that it's looking for." Young's modifications to the Readme, with testing, took almost a month to complete; however, she was not working exclusively on that project the whole time.

3

Although Cerner hired Young as a Level 6 computer engineer, Young admits that she did not perform her job in a satisfactory manner because she lacked the skills, knowledge or experience necessary to meet the expectations of her position. She also admits that Cerner misunderstood the extent of her knowledge and experience when they hired her. Young explained that she "felt like [she] had a kindergartner's level of experience with Informatica and was thrown in to a college level Informatica . . . ."

Because Cerner expected Young to be at the same level technically or more advanced than her peers, she was eventually placed on a Performance Improvement Plan to focus on improving her Informatica and SQL skills, as well as learn to take investigations and troubleshooting further on her own, instead of relying so much on the assistance of other people. The Performance Improvement Plan noted Young had been expected to take over responsibility for a project in the U.K., but that she was not able to meet that expectation. Further, it explained she often took considerable time completing projects, that she had syntactical errors in her Readme which she was unable to resolve, that she had difficulty reading and understanding source code and logic, that she had trouble translating pseudo-code to actual code, and that there was not a high level of trust in the quality of the code Young delivered. Thus, in order to improve her skills and abilities, the plan set out certain objectives for Young, including demonstrating the ability to deliver high quality code and comprehension of the defect and its resolution. Moreover, the plan required her to show her ability to resolve design questions and deliver medium and large size projects. Even with

4

this plan in place, Young failed to accomplish its objectives, resulting in Cerner extending the Performance Plan an additional thirty days.

Sometime during her employment at Cerner, Young applied for a position with the National Association of Insurance Commissioners (NAIC). According to the resume she submitted to the NAIC, her primary responsibility at Cerner was defect resolution, but that her other duties included: "[c]reate design specifications, design reviews and code review;" "[c]reate data diagrams to show how the information is being processed and to determine how to make the changes;" "[w]rote test plans and performed automated testing using Test Director and implementing code;" "[d]efect resolution for Informatica mappings;" "[c]reate design specifications for enhancements and corrections;" "Environment: SQL, SQL Server, Oracle." Young submitted her letter of resignation to Cerner on September 20, 2005.

## II.     Summary Judgment Standard

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A party who moves for summary judgment bears the burden of showing that there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). When considering a motion for summary judgment, a court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable

5

inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

To establish a genuine issue of fact sufficient to warrant trial, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing there is a genuine issue for trial. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citing *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361 (8th Cir. 1983)).

**III. Discussion**

    **A. Professional Employee Exemption**

The FLSA requires employers to pay their covered employees one and one-half times their regular hourly rate for each hour the employees work in excess of forty hours per workweek. *See* 29 U.S.C. § 207(a)(1). The FLSA, however, exempts "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). Further, the FLSA specifically exempts:

> any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is–
>
> > (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software, or system functional specifications;

6

> (B) the design, development, documentation, analysis, creation, testing, or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
> (C) the design, documentation, testing, creation, or modification of computer programs related to machine operating systems; or
> (D) a combination of duties described in subparagraphs (A), (B), and (C) the performance of which require the same level of skills, and
>
> who, in the case of an employee who is compensated on an hourly basis, is compensated at a rate of not less than $27.63.

29 U.S.C. § 213(a)(17); *see also* 29 C.F.R. § 541.400 (stating that computer systems analysts, computer programmers, software engineers and other similarly skilled workers are exempt under both § 213(a)(1) and § 213(a)(17)).

Section 213(a)(1) "applies to any computer employee compensated on a salary or fee basis at a rate of not less than $455 per week," while section 213(a)(17) "applies to any computer employee compensated on an hourly basis at a rate not less than $27.63 an hour." 29 C.F.R. § 541.400(b). Both these exemptions only apply to computer employees whose primary duty consists of:

> (1) The application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software or system functional specifications;
>
> (2) The design, development, documentation, analysis, creation, testing or modification of computer systems or programs, including prototypes, based on and related to user or system design specifications;
>
> (3) The design, documentation, testing, creation or modification of computer programs related to machine operating systems; or
>
> (4) A combination of the aforementioned duties, the performance of which requires the same level of skills.

7

*Id.* With a $65,000 yearly salary, Young meets the exemptions' wage requirements.

Young, in her attempt to set forth specific facts showing a genuine dispute, argues that she does not meet the FLSA's exemptions because she never wrote any code, but instead "transformed data." Her definition of code, however, is very narrow and limited only to the computer program's source code. Young admits that Cerner used the term code in several different ways, not just in reference to source code. Young's claims that she did not work with source code, though, are immaterial because the FLSA's exemptions do not use the term "code," and thus are much broader than her personal interpretation.

Young insists that her primary duty was defect resolution, and that she was simply told what the defect was and how to fix it. The facts, including her own deposition testimony, contradict this and show that her actual duties were almost identical to the ones listed on the resume she sent to the NAIC. Young admits that she "would try to fix the issue," and that if the program was not pulling the correct data, she "would change the statement or whatever it's asking for to pull the correct field." Young also admits that if she thought she'd determined how to fix a defect, she would fix it at that point in time. As part of her defect analysis, Young would look at a "lookup" to see if it was asking to pull the correct data from a database; if it was not, she "would change the statement or whatever it's asking for to pull the correct field."

Young also conducted white box and black box testing of her defect solutions to verify that her analysis, design and modifications met user and system design specifications. She explained that she would perform white box testing to test data that she had manipulated

8

in order to ensure she had the right data. She would perform black box testing to determine how the defect resolution worked in another environment and see whether it caused additional problems. Additionally, she would participate in Code Reviews with her peers to review her solution and check whether the defect was properly corrected.

Finally, Young admits that she was required to modify a portion of a Readme, including "typing in instructions for it, which function to call." These modifications, along with her testing, took almost a month to complete, indicating it was not a simple copy and paste solution. In fact, the Performance Improvement Plan noted she had numerous syntactical errors in the Readme which she was unable to resolve. Combined, these facts demonstrate Young was expected to apply her own knowledge and experience to the Readme project in order to find a workable solution.

Thus, it is clear from the record that Young did more than just follow instructions; although she might have been given some direction, ultimately her job was to apply some of her own analysis and judgment in resolving defects. Unfortunately, as Young admits, she did not have the technical knowledge Cerner expected of her, resulting in poor performance reviews and the implementation of a Performance Improvement Plan. This is not a situation where Yong failed to properly copy information or follow specific instructions; the facts show that she could not do the intermediate, independent analysis required in order to make the appropriate modifications (or transformations) to the programs or data on which she worked.

9

Viewing the evidence in the light most favorable to the plaintiff, Young's position at Cerner was exempt under the requirements of 29 U.S.C. § 213(a)(1), § 213(a)(17) and 29 C.F.R. § 541.400. No reasonable juror could find otherwise. Despite her claim that she did not create source code, her defect resolution duty still consisted of the application of systems analysis techniques and procedures to determine software or system functional specifications. Moreover, her defect resolution duty, at the very least, required the design, analysis, creation, testing and modification of computer systems or programs based on and related to user or system design specifications. In fact, this seems to have been the very essence of her job at Cerner: She analyzed problems with data retrieval and modified (or transformed) aspects of the program or data in order to correct the error. She would then test her solution, as well as discuss it with her peers to ensure quality. Whether she created or modified source code is immaterial to the application of this exemption. *See* 29 C.F.R. § 541.400(a); *cf. Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) (noting plaintiffs could not rely only on job description as evidence that they were misclassified as exempt, but that other tasks must also be considered); *Diaz v. Elec. Boutique of Am., Inc.*, No. 04-CV-0840E(SR), 2005 WL 2654270, at *2 (W.D.N.Y. Oct. 17, 2005) (explaining determination of exempt status requires detailed analysis).

Therefore, this Court concludes Young's position as a software engineer was exempt from the FLSA under 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.400, and that she is not entitled to overtime compensation under the Act.

**IV.    Conclusion**

Accordingly, it is hereby

ORDERED that Defendant Cerner Corp.'s Motion for Summary Judgment as to All Claims of Plaintiff Laurie Young [Doc. # 81] is GRANTED.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: August 28, 2007
Jefferson City, Missouri

11

Case 4:06-cv-00321-NKL   Document 96   Filed 08/28/07   Page 11 of 11